IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MANDI MARIE ALEXANDER,        )
                              )
            Plaintiff,        )
                              )
      v.                      )           1:14CV74
                              )
CAROLINA FIRE CONTROL INC.,   )
                              )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on Defendant Carolina Fire Control, Inc.'s ("Defendant" or "CFC") Motion for Summary Judgment [Doc. #24] on Plaintiff Mandi Marie Alexander's ("Plaintiff" or "Alexander") claims of Family Medical Leave Act ("FMLA") interference, Title VII sex discrimination, and North Carolina state wrongful discharge. Plaintiff opposed Defendant's Motion in a Response [Doc.#30] filed April 2, 2015. Defendant in turn filed a Reply on April 20, 2015. As discussed below, this Court will grant in part and deny in part Defendant's Motion for Summary Judgment [Doc. #24].

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Defendant is a fire sprinkler installer company owned by brothers Jeffery and John Sossoman. Plaintiff first began working for Defendant in April 2007 as an assistant project manager. In October of 2007, Plaintiff was promoted to a project manager position. Plaintiff continued working in this role until January of 2009, when she was terminated for insubordination. While Plaintiff contends that she was not insubordinate, Defendant asserts that

Plaintiff refused to communicate with her direct supervisor, Jack McDowell, the General Manager at the time. Plaintiff does not dispute that she received warnings that she needed to communicate and be courteous to McDowell and others within the company. According to Defendant, Plaintiff once "flipped the bird" at Jack McDowell when his back was turned to her, although Plaintiff denies ever doing so. Although apparently not a reason for her 2009 termination, Defendant highlights in its current briefings that Plaintiff was convicted of a DWI in 2007 which resulted in her driver's license being revoked. She received the DWI charge while driving a company car, after causing several thousand dollars of damage to the car. Plaintiff also has other traffic violations from the period of time during which she worked for Defendant, including a citation for driving with a revoked license sometime in 2009 or 2010.

Defendant rehired Plaintiff later on in 2009. The Parties, however, appear to dispute the circumstances that led to Plaintiff's rehiring. Plaintiff asserts that Defendant reached out to her about grooming her to take over Defendant's Virginia office, while Defendant contends that Plaintiff contacted Jeffery Sossoman and asked for her old job back. When Plaintiff did return, it is undisputed that she initially worked as an independent contractor, and not a direct employee of the company. In May of 2009, Plaintiff again became a full-time employee of Defendant, resuming her role as project manager. As she again began working as a direct employee of Defendant, Jeffery Sossoman informed Plaintiff that she needed to improve her communication issues with General Manager Jack McDowell.

The working relationship between Plaintiff and Defendant continued without apparent incident until 2012. In the first few days of August of 2012, Plaintiff's son was diagnosed with

2

cancer. Soon after receiving the news, Plaintiff went to Jeffery Sossoman in his office to tell him about her son's cancer diagnosis. Jeffery Sossoman responded in a "heartfelt" manner, giving Plaintiff a hug and telling Plaintiff that Defendant "would support [her] and to go take care of [her] son and to get in touch with [Jeffery] to let him know what was going on." (Alexander Dep. [Doc. #24-1], at 129:12-19.) Jeffery and Plaintiff exchanged texts and phone calls over the next few days as Plaintiff took her son to doctor appointments and began learning about her son's course of treatment. Jeffery continued to express his and CFC's support and well-wishes for Plaintiff and her family.

On approximately August 8, 2012, Defendant mailed Plaintiff a packet of information about leave options under the Family Medical Leave Act ("FMLA"). Plaintiff received and reviewed the information in the packet, "but did not read through it specifically to really absorb it." (Id. at 137:22-23.) Around the same time that Plaintiff received the packet, and within approximately two weeks[1] of Plaintiff's son being diagnosed with cancer, Plaintiff met with Jeffery and John Sossoman in John's office to discuss her employment possibilities during Plaintiff's son's cancer treatment. The conversation began with the Sossomans inquiring about Plaintiff's son and expressing their sympathy. Eventually the conversation turned to work expectations for Plaintiff during this time, and as Plaintiff explained in her deposition, the Sossomans "said there was no reason that I needed to fill out the [FMLA] paperwork, that we could come up with a plan outside of that, outside of the FMLA to work for everybody to where

---

[1] In her deposition, Plaintiff stated she believed the meeting took place on August 10, 13, or 16, 2012. (Alexander Dep. [Doc. #24-1], at 135:1-2.)

I could continue working and also receive my full salary." (<u>Id.</u>, at 141:1-5.)

Defendant contends that the Sossomans encouraged Plaintiff to take FMLA leave, but Plaintiff tearfully replied that she could not afford to take unpaid leave. Plaintiff, on the other hand, asserts that she never made any such statement, and that at that point in time, she was financially secure enough between savings and her parents' assistance that she did not need her normal salary. Further, Plaintiff contends that the Sossomans discouraged her from taking FMLA leave by instead developing a "plan" for her to continue working however much she could while still drawing her normal salary. While the Parties present different versions of this meeting, it is undisputed that this meeting occurred and during the course of the meeting, Plaintiff and the Sossomans agreed to a work situation whereby Plaintiff would continue to receive her full salary and benefits while doing whatever amount of work she was capable of during the period of her son's cancer treatment. As Plaintiff explained, "[t]he discussion was that I would work remotely as much as I could. . . . Jeff and Johnny would have a laptop set up for me to where I could access the company server and emails and things of that manner. I would also continue to use my company cell phone." (<u>Id.</u> at 145:12-18.) After this meeting, Plaintiff never requested FMLA leave nor inquired further about her FMLA options, and she instead "trusted that the plan that was put in place between [her]self, Jeff and Johnny . . . was going to be sufficient to where it wouldn't result in [Plaintiff] losing [her] job for lack of communication that should have been protected by FMLA." (<u>Id.</u> at 144:23-145:3.)

There were few set expectations for Plaintiff's work under this arrangement. The Sossomans and Plaintiff did not establish how many hours per week Plaintiff was expected to

work: "[T]here was no magic number that was set into place. It was basically you put in what you can, and we will go from there." (Id. at 148:13-15.) Plaintiff's remote work arrangement began on August 17, 2012, when Plaintiff picked up a laptop from Defendant's office. During the period from her son's diagnosis on approximately August 1 2012, up until August 17, 2012, Plaintiff worked a total of five or ten hours, but continued to receive her full salary and benefits. From August 17, 2012, until approximately January 7, 2013, Plaintiff worked remotely on a part-time basis, working approximately five to twenty-five hours per week. Defendant contends that Plaintiff worked slightly fewer hours, closer to an average of 12 hours per week, but neither Plaintiff nor Defendant tracked the number of hours Plaintiff actually worked during this time. Jeffery Sossoman and Plaintiff were in "constant communication" via cell phone and e-mail throughout this period. (Jeffery Sossoman Dep. [Doc. #24-5], at 42:16-43:4.) However, Plaintiff notes that there was no clear line drawn between her time working remotely and her time on leave, highlighting that she always had her work phone on. This arrangement persisted through at least mid-December 2012, or possibly until early January 2013. Defendant's employees recall Plaintiff being in the office full-time in December 2012, while Plaintiff maintains that her first day back on a full-time basis was January 7, 2013.

Plaintiff recalled two phone conversations with Jeffery Sossoman in which he was "upset" with Plaintiff's "lack of communication" or untimeliness in communication during her period of remote, part-time work. (Alexander Dep. [Doc. #24-1], at 154:4-12.) In one of these conversations, which took place in early October, 2012, Jeffrey Sossoman informed her that she needed to copy the then-General Manager, David Kepley, on all e-mails. According to Plaintiff's

deposition, this October 2012 conversation was to the effect that she "was not communicating fast enough on my projects and other people needed to be involved if I was not going to communicate quick enough and asked I [copy] David Kepley on all my emails from that point forward, so my items can be handled in a timely manner." (Id. at 94:2-7.) Plaintiff denies that any other meetings took place regarding her communication skills or work performance. In contrast, Jeffery Sossoman recalled at least two separate conversations between himself and Plaintiff that took place between mid-December 2012 and Plaintiff's termination on January 9, 2013. According to Jeffery Sossoman, he informed Plaintiff of specific problems with her work communications and attitude. These problems included that Plaintiff needed to report directly to General Manager David Kepley and communicate with him, as well as needing to copy Kepley and Construction Manager Allen Archer on project-related e-mails.

On January 9, 2013, John Sossoman, Jeffery Sossoman, David Kepley, and Allen Archer held a ten-minute meeting to discuss Plaintiff's employment with Defendant. Everyone in the meeting agreed that Plaintiff should be terminated for insubordination stemming from the alleged communication failures of Plaintiff. Subsequently, Jeffery Sossoman went to Plaintiff's office and explained to her that she was being terminated for insubordination. Plaintiff contends that Jeffery Sossoman did not elaborate on the specifics of her insubordination. However, in her deposition, Plaintiff acknowledged, without agreeing with the reasoning, that Defendant terminated her for an alleged insubordination due to lack of communication, particularly with David Kepley and the project team.

At the time Plaintiff was terminated, four other individuals, all men, were performing

sales and project management functions: Patrick Lam, Michael Holbrooks, David Kepley, and Jeffery Sossoman. (Lam Dep. [Doc. #24-2], at 27:25-28:8.) David Kepley and Jeffery Sossoman completed project management duties in addition to their other managerial responsibilities in the company. Upon Plaintiff's departure, her approximately 12 to 14 projects were divided among these remaining four project managers (Kepley Dep. [Doc. #24-4], at 44:9-11, 48:21-24.). In particular, Patrick Lam took over approximately five of Plaintiff's former projects, with the assistance of Jeffery Sossoman. Lam had been working with Defendant since 2009 at that time, and had been performing project management duties since January of 2012.

Plaintiff filed her Complaint [Doc. #1] on January 28, 2014 asserting violations of the FMLA, Title VII, and North Carolina public policy. Defendant filed a Partial Motion to Dismiss for Failure to State a Claim [Doc. #5] on March 31, 2014, requesting dismissal of Plaintiff's FMLA claims and requesting that Plaintiff's request for punitive or emotional damages be dismissed or stricken. On July 25, 2014, this Court denied Defendant's Motion to Dismiss as to Plaintiff's FMLA interference claim, but granted the motion as to Plaintiff's FMLA retaliation claim and Plaintiff's claim for punitive and emotional distress damages to the extent Plaintiff claimed such damages for her FMLA interference claim. On February 27, 2015, Defendant filed its present Motion for Summary Judgment [Doc. #24]. The motion is fully briefed and ripe for adjudication.

## II. LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Zahodnick v. Int'l Bus. Machs. Corp., 135

F.3d 911, 913 (4th Cir. 1997). "In considering a motion for summary judgment, the district court must 'view the evidence in the light most favorable to the' nonmoving party." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Tolan v. Cotton, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam)). A court's belief that the movant would prevail on the merits at trial is insufficient to grant a motion for summary judgment. Id. The court cannot make credibility determinations or weigh evidence, and "must disregard all evidence favorable to the moving party . . . that a jury would not be required to believe." Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 436 (4th Cir. 2001); see Jacobs, 780 F.3d at 568-69. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

III.    DISCUSSION

In its instant Motion for Summary Judgment, Defendant argues that there is no genuine issue of material fact and it is entitled to judgment as a matter of law on each of Plaintiff's claims. Plaintiff opposes summary judgment and contends that the facts support Plaintiff's view that Defendant violated the FMLA, Title VII, and North Carolina state law. The Court first considers Plaintiff's FMLA interference claim and concludes that summary judgment is not warranted on this claim. The Court then turns to a combined analysis of Plaintiff's Title VII and state wrongful discharge claims, determining that summary judgment will be granted in favor of Defendant on these two claims.

8

A.      Plaintiff's FMLA Interference Claim

Plaintiff contends that Defendant improperly interfered with her FMLA rights by discouraging her from taking formal FMLA leave, which in turn led to her eventual termination. Defendant asserts that it never discouraged Plaintiff from taking FMLA leave, and that Plaintiff cannot show such interference or any prejudice suffered as a result of the alleged interference.

Under the FMLA, an eligible employee is entitled to 12 weeks of unpaid leave during any 12-month period for specific medical and family reasons, including "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise or attempted exercise of any FMLA right.  Id. § 2615(a)(1).  A successful FMLA interference claim requires the plaintiff to establish that "(1) [s]he was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [s]he was entitled."  Burnett v. LFW Inc., 472 F.3d 471, 477 (7th Cir. 2006);  see Sanders v. City of Newport, 657 F.3d 772, 778 (9th Cir. 2011); Hoge v. Honda Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004); Rodriguez v. Smithfield Packing Co., 545 F. Supp. 2d 508, 516 (D. Md. 2008) (citing Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006)). Discouraging an employee to take FMLA leave constitutes interference. 29 C.F.R. § 825.220(b); Croy v. Blue Ridge Bread, Inc., No. 3:12CV00034, 2013 WL 3776802, at *8 (W.D. Va. July 15, 2013).

The plaintiff must further prove that she suffered prejudice as a result of the alleged FMLA violation.  E.g. Ranade v. BT Americas, Inc., 581 Fed. Appx. 182, 184 (4th Cir. 2014)

9

(citing <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89, 122 S. Ct. 1155, 1161, 152 L. Ed. 2d 167 (2002) and 29 U.S.C. § 2617(a)(1)).  "Prejudice exists where an employee loses compensation or benefits 'by reason of the violation,' sustains other monetary losses 'as a direct result of the violation,' or suffers some loss in employment status remediable through 'appropriate' equitable relief. "  <u>Reed v. Buckeye Fire Equip.</u>, 241 F. App'x 917, 924 (4th Cir. 2007) (citations omitted) (quoting 29 U.S.C. §§ 2617(a)(1)(A)(i)(I), (A)(i)(II), (B)); <u>see</u> <u>Ragsdale</u>, 535 U.S. at 89, 122 S. Ct. at 1161.

In the present matter, Defendant only disputes the fifth element of an interference claim—that Defendant denied Plaintiff FMLA entitlements—and that Plaintiff suffered prejudice as a result of Defendant's alleged FMLA violation.  Plaintiff contends that the Sossomans discouraged her from taking FMLA leave, thereby interfering with her FMLA entitlements.  In turn, Plaintiff argues, the work and leave scheduled arranged by the Sossomans caused her to ultimately be terminated for lack of communication, thus resulting in prejudice to her.

Taking the facts in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether she was discouraged from taking FMLA leave during the meeting in which she and the Sossomans agreed to a plan whereby she would be paid her full salary and work as many hours as she could while caring for her son.  According to Plaintiff, during that meeting, Jeffery Sossoman told her "there was no reason that I needed to fill out the paperwork, that we could come up with a plan outside of that, outside of the FMLA to work for everybody to where I could continue working and also receive my full salary."  (Alexander Dep. [Doc. #24-1], at 141:1-5.)  Plaintiff trusted the Sossoman brothers in their presentation of this plan, and thus she

10

never inquired further about her FMLA rights or options. From these facts, a jury could reasonably infer that Defendant interfered with Plaintiff's FMLA rights by encouraging her to accept a plan outside the purview of the FMLA, and in turn discouraging Plaintiff from seeking to invoke her specific rights under the FMLA.

Likewise, genuine issues of material fact exist as to whether Plaintiff suffered prejudice as a result of the possible interference. Here, Plaintiff asserts that her termination and consequent loss of salary and benefits was prejudice which resulted due to Defendant's alleged interference. In assessing whether prejudice occurred, the Court must consider "whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions," including "what steps the employee would have taken had circumstances been different." Ragsdale, 535 U.S. at 91, 122 S. Ct. at 1162; see Moticka v. Weck Closure Sys., 183 Fed. Appx. 343, 347-348 (4th Cir. 2006) ("Accordingly, under Ragsdale, courts must undertake a 'fact-specific inquiry into what steps the employee would have taken had the employer given the required notice.' " (quoting Ragsdale, 535 U.S. at 91, 122 S. Ct. at 1162)); Bullock v. Kraft Foods, Inc., No. 3:11CV36-HEH, 2011 WL 5872898, at *5 (E.D. Va. Nov. 22, 2011) ("To determine if a plaintiff has met its burden to show that she suffered harm "by reason of" or "as a direct result of" her employer's unlawful actions, a court must ask 'what steps the employee would have taken . . . in the absence of the employer's actions.' "(quoting Ragsdale, 535 U.S. at 89-91, 122 S. Ct. at 1161-62)), aff'd, 501 F. App'x 299 (4th Cir. 2012).

Defendant primarily argues that Plaintiff cannot show prejudice because Defendant paid Plaintiff her full salary and benefits for the duration of the time she was working only part-time. In doing so, Defendant relies on two cases in which the respective district courts determined

11

prejudice could not be shown on FMLA interference claims where the respective employees were paid their full salaries while on leave. See Croy, 2013 WL 3776802; Campbell v. Verizon Va., Inc., 812 F. Supp. 2d 748 (E.D. Va. 2011). Both of these cases are distinguishable from the present case before the Court. In Croy, the plaintiff worked reduced hours during a ten-day span, during which his employer paid his full pay rate during the time. 2013 WL 3776802, at *8. The employer technically violated the FMLA by failing to designate the time off as FMLA leave, but the plaintiff was unable to show any harm as a result of this violation. Id. Thus, the nature of the interference was different than that asserted in the present matter, where Plaintiff was not actually on FMLA leave and was allegedly discouraged from taking such leave. Moreover, the plaintiff in Croy did not contend that his eventual termination was a result of the FMLA violation, as Plaintiff suggests here.

Similarly, in Campbell, the FMLA violation was premised on the employer's alleged failure to comply with the applicable notice requirements regarding designating employer-provided paid leave as FMLA leave. Campbell, 812 F. Supp. 2d at 756. The court concluded that no such violation occurred and that the employer provided the employee with the necessary notice, and that even if the notice were nonetheless insufficient, the plaintiff could not have suffered prejudice because he "subjectively understood that his approved leave would be designated as FMLA leave." Id. at 757. While the court did emphasize that the employer had provided the employee his full pay while he was on intermittent leave, it did so regarding plaintiff's complaints as to how the employer substituted and designated paid leave as FMLA leave. Id. Thus, the plaintiff's leave was actually under the protections of the FMLA as in Croy, the nature of the alleged interference was not discouragement against taking leave but rather a

technical violation of notice requirements, and finally, the plaintiff in <u>Campbell</u> did not allege that the asserted FMLA violation led to his termination. The fact that the plaintiff was paid her full salary is not dispositive given the FMLA violation alleged and the working arrangement developed by Defendant. <u>See</u> <u>Evans v. Books-A-Million</u>, 762 F.3d 1288, 1296-97 (11th Cir. 2014).

Defendant correctly observes that this Court previously dismissed Plaintiff's FMLA retaliation claim. Therefore, any suggestion by Plaintiff that Defendant intentionally terminated her in response to her taking leave is without merit. However, it appears that an employee's termination and the surrounding consequences may be properly considered in the context of an FMLA interference claim. <u>See</u> <u>Edusei v. Adventist Healthcare, Inc.</u>, No. DKC 13-0157, 2014 WL 3345051, at *6 (D. Md. July 7, 2014) (citing, <u>inter alia</u>, <u>Yashenko v. Harrah's NC Casino Co., LLC.</u>, 446 F.3d 541, 550-51 (4th Cir. 2006)) (noting that the Fourth Circuit "made no indication that [termination] was not viable under the interference theory" when "examining a district court decision granting summary judgment on such a claim"). In <u>Edusei</u>, the district court determined at the summary judgment stage that the plaintiff could "claim interference with her FMLA rights in the form of the suspension and termination." <u>Id.</u> The plaintiff argued that the defendant-employer's denial of an extension of her FMLA leave led to a one day suspension and a final warning which precipitated the plaintiff's termination nineteen months after her return to work. <u>Id.</u> The plaintiff received the final warning when she did not return to work as instructed by the defendant. <u>Id.</u> at *3. Because the plaintiff had received this final warning, her later unexcused absence was grounds for termination. <u>Id.</u> at *4. Thus, the plaintiff in <u>Edusei</u> advanced the same "but-for" analysis as Plaintiff in the present case, in that the reason for Plaintiff's termination

13

would not have existed if the alleged FMLA violation had not occurred. Much like the plaintiff in <u>Edusei</u>, Plaintiff here has created a triable issue of fact as to whether her termination, and the consequent monetary losses, constitutes prejudice resulting from an FMLA violation.

Plaintiff contends that the reasons for her termination were a result of her attempts to work remotely while on leave per the work arrangement between her and Defendant. According to Plaintiff, these reasons for her termination would not have existed if she had been on intermittent FMLA leave, and in turn, she would not have been terminated. Plaintiff contends that the plan whereby she worked remotely when her schedule permitted prevented her from communicating effectively and according to Defendant's expectations. These communication difficulties would not have occurred if she had been on a form of intermittent FMLA leave, under which her in-office working time would have been clearly demarcated from her out-of-office leave time, and Defendant could not have required nor expected her to respond to work communications while on leave and out of the office. <u>See</u> <u>Evans</u>, 762 F.3d at 1295-97 (holding that summary judgment was inappropriate where plaintiff was forced to work during paid maternity leave and defendant may have relied on the plaintiff's work performance during this time in deciding to reassign employee to a different department). Defendant, however, casts the whole situation as one under which it sought to accommodate Plaintiff as much as possible, and did so in a manner exceeding the requirements of the FMLA.

Mindful of the fact that Defendant paid Plaintiff her full salary, there nonetheless remain disputes of material fact as to the precise communication failures of Plaintiff, when they occurred, and whether they occurred during a time that would have been covered under the FMLA. Plaintiff suggests that she was only told twice, during phone conversations with Jeff

14

Sossoman, about communication inadequacies that stemmed from her inability to quickly respond to matters while taking care of her son. These two instances occurred in October 2012. Defendant, however, contends that Plaintiff was back to her normal work schedule in December 2012—a fact disputed by Plaintiff—and that subsequent to Plaintiff's return, Plaintiff exhibited communication failures, particularly in not communicating with David Kepley or Allen Archer. According to Jeffery Sossoman, he discussed these problems with Plaintiff prior to her termination on at least two separate occasions, both of which occurred between December 2012 and Plaintiff's termination in January 2013. Plaintiff disputes that these conversations occurred. The conflict between Plaintiff's recollection and Jeffery Sossoman's recollection creates a dispute of material fact, both because the Parties dispute which conversations occurred, and also because the Parties dispute whether these communication failures and corresponding conversations took place when Plaintiff had returned to work full time or while she was still working part-time remotely. The nature of the communication inadequacies is likewise disputed, with Plaintiff suggesting that she complied with Defendant's communication requests during her work-time and according to the special work arrangement in place during her part-time work schedule. Plaintiff highlights that Jeffery Sossoman testified that he and Plaintiff were constantly communicating, and that General Manager David Kepley testified that "Jeff Sossoman was handling" supervising Plaintiff up until mid-December 2012. (Kepley Dep. [Doc. #24-4], at 26:7-8, 27:5-9.) Indeed, Kepley characterized Plaintiff's problems during this time period as being "a lack of communication," which is in line with Plaintiff's depiction of the facts. Defendant, in contrast, argues that Plaintiff failed to copy her direct supervisor, General Manager Kepley, on company e-mails. The Court finds that a reasonable jury could determine

15

that any communication inadequacies stemmed from what Plaintiff contends were Defendant's unrealistic expectations for Plaintiff while she was caring for her son. Plaintiff also argues that these communication shortcomings could not have occurred if Plaintiff had been on FMLA leave.

Plaintiff's theory of the prejudice suffered may be tenuous, especially when Defendant appears to have been quite generous in paying Plaintiff her full salary and benefits during the time of her part-time leave and remote work. Nonetheless, in considering the steps Plaintiff would have taken had Defendant not allegedly discouraged her from taking FMLA leave, there is sufficient evidence to create a dispute of fact as to whether Plaintiff would have still experienced any alleged communication shortcomings that are alleged to have resulted in her ultimate termination. See Ragsdale, 535 U.S. at 89-91, 122 S. Ct. at 1161-62; Evans, 762 F.3d at 1296-97; Edusei, 2014 WL 3345051, at *6. The Court finds that there are a number of disputed material facts as to whether Plaintiff's communication problems were a result of the indistinct delineation between the expectations of Plaintiff while working remotely and her true "leave" time. To the extent that Plaintiff's version of events and Defendant's version of events clash in material respects, such differences and credibility determinations should be resolved by a jury, and not this Court on a motion for summary judgment. As such, the Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's FMLA interference claim.

B. Plaintiff's Title VII Gender Discrimination Claim and North Carolina Wrongful Discharge Claim

Defendant also asserts that Plaintiff's Title VII sex discrimination and state wrongful discharge claims are unsupportable and fail as a matter of law. Plaintiff claims that Defendant

16

terminated her because of her sex, in violation of North Carolina state law and Title VII's protections against such employment discrimination. Because "the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating" a state wrongful discharge claim under N.C. Gen. Stat. § 143-422.2, the viability of Plaintiff's North Carolina wrongful discharge claim can be considered simultaneously with her Title VII claim. See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995).

Under Title VII, employers are prohibited from taking a variety of employment actions, including termination, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a violation of this statute by producing direct evidence of discrimination, or by employing the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); see Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc). Under the McDonnell Douglas burden-shifting "pretext" framework, the plaintiff must first demonstrate a prima facie case of discrimination by establishing that

> (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

Hill, 354 F.3d at 285; see McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Collins v. Balt. City Bd. of Sch. Comm'rs, 528 Fed. Appx. 269, 271-72 (4th Cir. 2013). The fourth element adapts to the particular factual circumstances of the case, but must ultimately be shown by "circumstances giving rise to a reasonable inference of unlawful discrimination." Cooper v. Martek Biosciences Kingstree Corp., 2013 U.S. Dist. LEXIS 31616, at *21 (D.S.C. Jan. 25, 2013)

17

(citing Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir. 2005)). The purpose of the prima facie case under McDonnell Douglas is to weed out the most common reasons for an adverse employment action, thus creating an inference of discrimination rebuttable by the defendant. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981). Once a plaintiff "establishes a prima facie case, the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for its actions." Kinser v. United Methodist Agency for the Retarded-Western North Carolina, 2015 U.S. App. LEXIS 8733, at *3-5 (4th Cir. May 27, 2015) (citing Hill, 354 F.3d at 285); see Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000). Once the defendant meets this burden, all presumptions of discrimination disappear, and the plaintiff must show that the defendant's proffered reason is in actuality mere pretext for intentional discrimination. Reeves, 530 U.S. at 142-43, 120 S. Ct. at 2106; Hill, 354 F.3d 277, 285. A plaintiff may satisfy this burden by producing evidence indicating that the defendant's reason was " 'unworthy of credence' or was a cover-up for unlawful discrimination." Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 211 (4th Cir. 2014) (quoting Burdine, 450 U.S. at 256, 101 S. Ct. at 1095).

In the present case, Defendant contends that Plaintiff has failed to establish the third and fourth elements of a prima facie case, and that Plaintiff cannot carry her ultimate burden to show that Defendant's reasons for terminating Plaintiff were mere pretext. The Court finds merit in Defendant's position in this regard.

As to the third element of the prima facie case, that is, that Plaintiff was satisfactorily performing her job duties at the time of termination, Defendant highlights Plaintiff's

communication difficulties and inability to comply with specific requests of her supervisors to better communicate. Plaintiff, in turn, does not produce any evidence indicating her satisfactory performance beyond a citation to an allegation of her Complaint, and instead argues that Defendant was aware of Plaintiff's inability to communicate quickly while taking care of her son. Even if the Court generously construes Plaintiff's argument as one suggesting that Defendant's expectations for communication were illegitimate,[2] Plaintiff has nonetheless not met her burden of showing that she was meeting other, legitimate expectations of Defendant. Plaintiff has not produced any evidence whatsoever as to the work Plaintiff was producing prior to her termination, whether the quality was satisfactory, or any other evidence tending to show Plaintiff was meeting her employer's expectations. Importantly, Plaintiff's own self-assessment or any coworker's opinions would be irrelevant; instead, Plaintiff must produce evidence that her supervisors found her work satisfactory. Arthur v. Pet Dairy, 593 Fed. Appx. 211, 217 (4th Cir. 2015); see Mabry v. Capital One, N.A., No. GJH-13-02059, 2014 U.S. Dist. LEXIS 167153, at *10-11 (D. Md. Dec. 3, 2014) (noting that employee's "self-serving allegations" of competence and satisfactory performance cannot create an issue of fact at the summary judgment stage). To this end, the only evidence in the record of Plaintiff's supervisor's appraisals of her work during the relevant time period are discussing Plaintiff's poor, unprofessional communication skills.[3]

---

[2] Such an argument would be better cast and asserted at the final, "pretext" stage of the McDonnell-Douglas burden-shifting scheme. Indeed, Plaintiff confusingly includes her arguments regarding pretext under the heading for and within her argument regarding the third element of the prima facie case. (See Pl.'s Mem. Opp. Def.'s Mot. Summ. J. [Doc. #31], at 16-17.)

[3] While arguing about pretext, Plaintiff also suggests that Defendant's reasons for Plaintiff's termination are inadequate because had Plaintiff been on FMLA leave, Plaintiff's communication problems would not have existed. To the extent this argument is relevant to the

Plaintiff has not met her burden of production as to this third element of the prima facie case under McDonnell-Douglas.

Even if Plaintiff could satisfy the third element, her case as to the fourth element—that is, that she was replaced by someone outside her protected class—is likewise unavailing. Plaintiff believes that Patrick Lam replaced her several months after she was terminated. In making this argument, Plaintiff highlights a number of projects Lam took over once she was terminated. Plaintiff further points to the fact that Lam received a company car, a company phone, and Plaintiff's office after her termination. Plaintiff emphasizes these facts in an attempt to suggest that Lam replaced Plaintiff because he was given benefits which Plaintiff previously received when she was a project manager.

However, Defendant's undisputed evidence establishes that Lam did not replace her, and instead, her job duties were distributed among remaining project managers upon her termination. Lam began working for Defendant around the end of June 2009, as an entry-level designer engineer. He continued in that position until January of 2012, when he moved into a role of "Small contracts estimator, small sales project manager," in which he continued to do some design duties, but was also given additional, new responsibilities in the realm of project management. (Lam Dep. [Doc. #24-2], at 14:13-14.) Lam reported to Mike Wise, the then-General Manager. David Kepley, who was then a project manager, oversaw Lam's new day-to-day project management tasks. Lam testified that in this new role, "I was able to estimate small

_____

prima facie case, the argument does not help Plaintiff, as Plaintiff all but admits that she was not performing adequately at the time of her termination. To the extent the cause of the inadequate work performance was caused by an FMLA violation, such a cause does not relieve Plaintiff of the burden of showing the third element of the prima facie case. Moreover, Plaintiff has not shown how the alleged FMLA violation is indicative of sex discrimination under Title VII.

jobs, project managing so I would project manage myself. I would still design them like I was before. But I think the biggest [difference] was definitely the project managing and the estimating of the small projects." (Id. at 15:24-16:3.) When asked if his job ever changed after the January 2012 transition, Lam responded it did not. Lam also explained that he became a project manager "roughly the same time when I moved into doing small sales." (Id. at 17:14-15.) In other words, Lam began working as a project manager in January of 2012, and his role has largely remained unchanged since then: "The only difference, as a company we're busier so I'm busier, but I'm doing the exact same duties." (Id. at 20:24-21:1.) He continues to project manage small contracts. While he has been involved with some larger projects in more recent years, "80 to 85 percent of the jobs [he does] are small contracts." (Id. at 17:21-23.) Lam testified that he received a cell phone sometime around December 2012 or January 2013, not specifically after Plaintiff's termination. (Id. at 21:14-19.) He also explained that had he declined to take Plaintiff's office when it was offered to him, someone other than him would have moved into Plaintiff's office. Lam received no explanation for receiving the company car in early 2013; there was no indication he received it because he had somehow replaced Plaintiff.

It does not appear from the facts that anyone has filled Plaintiff's position, and instead, the remaining project managers have all worked together to take on the additional work left in her absence. The reassignment of a portion of Plaintiff's responsibilities to a male coworker, Patrick Lam, is insufficient to show she was replaced or to otherwise indicate any inference of sex discrimination in satisfaction of the fourth prong of the prima facie case. E.g. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518-20 (4th Cir. 2006) (plaintiff failed to satisfy fourth prong of prima facie case when employer had evidence that his job duties were spread out among

remaining employees and employee had no evidence that he was actually replaced); <u>Grosjean v.</u> <u>First Energy Corp.</u>, 349 F.3d 332, 336 (6th Cir. 2003) ("A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." (internal quotation marks omitted) (quoting <u>Barnes v. GenCorp Inc.</u>, 896 F.2d 1457, 1465 (6th Cir. 1990))); <u>Lilley v. BTM Corp.</u>, 958 F.2d 746, 752 (6th Cir. 1992) (fourth element not satisfied where employee's job responsibilities were divided among remaining sales staff, even when a pick-up in business later created a need to hire a new employee); <u>Rouse v. Fed. Express</u>, No. 4:10-cv-2275-RBH-TER, 2012 WL 3157009, at *6 (D.S.C. June 22, 2012) ("Courts uniformly recognize that spreading the former duties of a terminated employee among the remaining employees does not constitute replacement sufficient to establish a prima facie case of discrimination." (citations omitted) (internal quotation marks omitted)).  It is the Court's determination that Plaintiff has failed to show that she was replaced, or that the circumstances of her termination otherwise gave rise to an inference of discrimination.  <u>C.f.</u>  <u>Blistein v. St.</u> <u>John's College</u>, 74 F.3d 1459, 1470 (4th Cir. 1996) (explaining that the fourth element is modified in a reduction-in-force case so that the plaintiff must show either that similarly qualified individuals outside the protected class were retained in the same position as the plaintiff, or that the employer otherwise did not treat the protected trait neutrally in making its workforce reduction decisions)

Finally, even if Plaintiff could establish a prima facie case, Plaintiff cannot show that Defendant's offered reasons for her termination were pretextual.  Defendant asserts that Plaintiff was terminated due to her insubordination and communication failures.  Specifically,

Defendant has explained that Plaintiff maintained a poor, discourteous attitude and failed to comply with requests for her to communicate with her direct supervisor after being repeatedly asked to do so. Plaintiff, on the other hand, has failed to forecast any evidence to suggest that discriminatory animus in actuality fueled Defendant's decision to terminate her. See Collins, 528 Fed. Appx. at 271-72 ("[T]o avoid summary judgment, Collins must produce evidence that the School Board's stated reason for the adverse action is pretextual. However, '[t]he ultimate burden of persuading the trier of fact that the [School Board] intentionally discriminated against [Collins] remains at all times with [Collins].' " (quoting Reeves, 530 U.S. at 143, 120 S. Ct. at 2106)). "[T]o demonstrate pretext, a plaintiff either must show that the employer's explanation for the employment action is 'unworthy of credence,' or offer evidence probative of intentional discrimination." Tsai v. Md. Aviation, 306 Fed. Appx. 1, 6 (4th Cir. 2008) (quoting Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004)). Plaintiff suggests that Defendant's reason for her termination is unworthy of credence because if Plaintiff had been on FMLA leave, she would not have been expected to communicate with Defendant. This argument, without more, only confuses the two statutory actions at issue in this case—an FMLA interference claim and a Title VII sex discrimination claim—and does not indicate that Defendant's proffered reason was mere pretext for sex discrimination.

The Court therefore finds that Plaintiff has failed to produce evidence from which a reasonable jury could infer that she was discriminated against on account of her sex. In addition, Plaintiff has not established the third and fourth elements of her prima facie case, nor has she identified genuine issues of material fact as to these elements. Likewise, Plaintiff has not established or put in dispute material facts that would indicate Defendant's offered reasons for

23

termination were pretextual. Accordingly, summary judgment for Defendant is proper as to Plaintiff's Title VII sex discrimination claim and North Carolina wrongful discharge claim. Tsai, 306 Fed. Appx. at 6 (summary judgment was warranted where the plaintiff "failed to identify evidence that could lead a reasonable juror to find that [the defendant] discriminated against him"); Runnebaum v. NationsBank of Maryland, N.A., 123 F.3d 156, 164 (4th Cir. 1997).

## IV.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment will be granted in part and denied in part. Specifically, Defendant's Motion will be granted as to Plaintiff's Title VII sex discrimination claim and North Carolina state wrongful discharge claim. Defendant's Motion will be denied as to Plaintiff's FMLA claim, because genuine issues of material fact exist as to whether Defendant discouraged Plaintiff from taking FMLA leave and whether Plaintiff's termination resulted as a consequence of that discouragement.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's FMLA interference claim, and GRANTED as to Plaintiff's Title VII sex discrimination claim and state wrongful discharge claim.

This the 18th day of June, 2015.


                                                    _____
                                                    United States District Judge

Case 1:14-cv-00074-SDT-JEP   Document 42   Filed 06/18/15   Page 25 of 25